**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.  01-688-CR-GOLD/SIMONTON**

**UNITED STATES OF AMERICA,**

           **Plaintiff,**

**v.**

**MANUEL DE JESUS FLORIAN,**

           **Defendant.**
_____/

**REPORT AND RECOMMENDATION**

        Presently pending before this Court are Defendant Manuel de Jesus Florian's duplicate Motions for Specific Performance of the Plea Agreement (DE ## 33, 34).  This matter has been referred to the undersigned Magistrate Judge to conduct an evidentiary hearing (DE # 37).  The motion is fully briefed (DE ## 36, 50, 51).  On August 10, 2005 and August 18, 2005, an evidentiary hearing was held on the motion.  At the conclusion of the hearing, the undersigned Magistrate Judge set forth findings and announced that she was recommending that the motion be denied.  For the reasons stated on the record at the hearing, and elaborated upon below, the undersigned recommends that the motion be denied.

        **I.  Background**

        On July 25, 2001, Defendant Manuel de Jesus Florian (hereafter Florian) was charged in a two count information with violations of 21 U.S.C. §§ 846 and 963 (DE # 1).

        Florian waived indictment (DE # 16).  On September 7, 2001, Florian, pursuant to a written plea agreement, pleaded guilty to Count I of the information, which charged him with conspiracy to possess with the intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846 (DE # 22).  Pursuant to the plea agreement,

Florian agreed to cooperate fully with the United States in the prosecution of others (DE

# 23 at 4-6, ¶¶ 10, 12).  The plea agreement states regarding Florian's cooperation:

> This office reserves the right to evaluate the nature and extent of
> defendant's cooperation and to make the defendant's cooperation, or lack
> thereof, known to the court at the time of sentencing.  If in the sole and
> unreviewable judgment of this Office the defendant's cooperation is of
> such quality and significance to the investigation or prosecution of other
> criminal matters as to warrant the court's downward departure from the
> sentence required by the Sentencing Guidelines, this Office may at or
> before sentencing make a motion pursuant to Section 5K1.1 of the
> Sentencing Guidelines, 18 U.S.C. §3553(e), or a Rule 35 motion subsequent
> to sentencing, reflecting that the defendant has provided substantial
> assistance and recommending sentence reduction.  The defendant
> acknowledges and agrees, however, that nothing in this Agreement may be
> construed to require this Office to file such a motion and that this Office's
> assessment of the nature, value, truthfulness, completeness, and accuracy
> of the defendant's cooperation shall be binding on the defendant.

 (DE # 23 at 5, ¶11).

At the time of his plea, Florian stated that he understood each of the provisions

contained in the written plea agreement and that no promises had been made to him

which were not set forth in the written plea agreement (GX 1 at 10).

On November 26, 2001, Florian was sentenced on Count I to 87 months

imprisonment to be followed by five years of supervised release (DE # 28).

Before and after the plea agreement and sentencing, Florian attempted to assist

the government in the prosecution of others by providing information concerning his

knowledge of criminal activities.  The government found that Florian's cooperation was

neither truthful nor fully complete, and did not file a motion to reduce Florian's sentence.

This motion followed.

II. <u>The Positions of the Parties</u>

A. <u>Florian's Position</u>

Florian contends that the government acted in bad faith in failing to file a motion

2

to reduce sentence, pursuant to Fed.R.Crim.P. 35, after Florian, pursuant to his plea agreement, cooperated with the government leading to arrests.  Florian asks that the government be compelled to enforce his plea agreement and to file a Rule 35 motion (DE # 34).  Florian further contends that nothing in the plea agreement obligated him to disclose any uncharged misconduct he participated in prior to his entry into the agreement (DE # 50).

B.  **The Government's Position**

The government asserts that it did not breach Florian's plea agreement by refusing to file a Rule 35 motion to reduce Florian's sentence.  The government states that even though Florian had provided cooperation in the investigation, the government learned that Florian had not told the truth concerning all the narcotics transactions in which he had participated with the other conspirators.  The government notes that under the specific language contained in Florian's plea agreement, the government has sole and essentially unreviewable discretion to determine whether Florian's cooperation amounted to substantial assistance.  The government also states that it did not act in bad faith in evaluating Florian's cooperation (DE # 36).  Finally, the government asserts that no government agent made promises to Florian regarding a sentence reduction or any potential reduction percentage (DE # 51).

III.  **The Evidentiary Hearing**

A.  **Florian's Case**

1.  **Testimony of FBI Special Agent Willie Joe Knight**

FBI Special Agent Willie Joe Knight was the co-case agent on the Ricardo Alfonso investigation from 1999 through 2002.  On or about October 20, 2000, an informant gave Knight information regarding Alfonso and Alain Piedra, which led to their arrests on

3

October 27, 2000 in connection with a 50 kilogram shipment of sham cocaine.  After Alfonso was arrested, he identified Florian to Agent Knight as a co-conspirator.

On October 31, 2000, Agent Knight apprehended Florian.  Florian admitted his part in the sham cocaine transaction and identified four other episodes, one in August 2000, two in September 2000, and one in October 2000, where he had been involved in smuggling cocaine through the Port of Miami.  Florian told Knight he still had $5,000.00 he had been paid in connection with the transactions, and gave the money to Knight.[1] Florian was not formally arrested at that time.

At that time, the government and Florian entered into a verbal cooperation agreement.  The prosecutor was not a party to this agreement.  Agent Knight hoped to identify and arrest other participants.  As discussed in more detail below, Florian identified Mario Sosa as a person involved in smuggling drugs through the Port.  Knight told Florian he wanted to know every time that Sosa came to Miami.  Knight told Florian that if he cooperated and provided substantial assistance, there was the possibility of a sentence reduction.  Knight never promised Florian a specific reduction.  Knight testified that he may have told Florian that he would make a recommendation regarding a sentence reduction, but Knight did not tell Florian what he would recommend.

At the time he was approached by Agent Knight, Florian was one of the supervisors for Seaboard Marine at the Port of Miami.  Florian had access to all areas at the Port of Miami involving Seaboard Marine, and to all of Seaboard's records.  Florian told the government that Mario Sosa, who actually transported the drugs into Miami and delivered the drugs to Alfonso and Piedra, served as a crewman on a Seaboard Marine vessel that docked in Miami every Wednesday.  Florian described the smuggling

---

[1]  The government subsequently forfeited the money.

operation as follows.

Florian had the ability to meet Sosa's ship when it docked.  Sosa would leave the ship and meet Florian at Florian's company truck.  Sosa would pass the cocaine to Florian in the truck on the dock.  Florian would hide the cocaine in the truck and take it out of the port.  Agent Knight knew that an ordinary citizen would not have been able to drive into the port and meet a cargo boat.

Agent Knight then provided Florian with a tape recorder.  On November 1, 2000, November 4, 2000, November 8, 2000, and November 9, 2000, Florian tape recorded conversations with Sosa and with Edwin Reyes.  Reyes was the overseas source who provided the drugs to Sosa.  The government believed that Reyes lived in Honduras and provided Sosa with the cocaine when Sosa's ship stopped in Honduras.  The taped discussions indicated that Reyes and Sosa knew that Alfonso and Piedra had been arrested, and that Reyes needed someone who could distribute the drugs in Miami.  In the November 9, 2000 call, Reyes indicated that he had more cocaine ready to be shipped.  From mid-November 2000 through early January 2001, Knight was out of town, and was unable to set up a controlled transaction.  Agent Knight told Florian to postpone the deal, and Knight was under the impression that Florian had done so.  Starting in November 2000 through December 2001, Florian told the agents that Sosa was not on the ship that came to Miami every Wednesday.

If Sosa was not on the boat, the agents assumed there was no delivery of cocaine. The agents believed Florian.  It was difficult for the agents to investigate in the Port of Miami, because of the port's surveillance and the presence of union representatives. Florian was the eyes and ears of the agents with the port.  The government was not able to intercept any subsequent shipments.

On July 3, 2001, Agent Knight formally arrested Florian.  Florian was released on a low bond and was allowed to travel out of the country.  On September 7, 2001, Florian entered into a written plea agreement and pleaded guilty.  On November 26, 2001, Florian was sentenced to 87 months imprisonment.  At that time, the government did not file a motion to reduce Florian's sentence.

In early December 2001, Florian called co-case agent Sherrie Gordon from prison and told her that Sosa was arriving in Miami on the ship.  Sosa was arrested on December 6, 2001 and was charged with participating in the cocaine conspiracy from 1999 through November 2000.

After Sosa was arrested, he told Agent Knight that Florian was Sosa's contact at the Port of Miami, and that on numerous occasions, Sosa had provided Florian with cocaine for the Alfonso organization.  Knight already knew much of this from the investigation.  Sosa also told the government, giving specific dates and quantities, that the number of drug transactions he had conducted with Florian was vastly different that the number of transactions disclosed by Florian.  Specifically, Sosa told the government that he had delivered cocaine to Florian on November 22, 2000, November 29, 2000 and on December 6, 2000.  Sosa also told the government that he had arrived in Miami on the ship on dates on which Florian had told the government that Sosa was not in Miami.

When Agent Knight confronted Florian with Sosa's account of these transactions, Florian said they never happened.

The government then conducted an investigation to ascertain whether Sosa or Florian was telling the truth.  To corroborate Sosa's story, Agent Knight obtained records from Sosa's employer, Seaboard Marine, indicating when Sosa was in Miami. The records indicated that Sosa was in Miami in November 2000, December 2000 and

into 2001.  This confirmed Sosa's account, not Florian's.

For example, Seaboard's records indicated that Sosa had been on a boat that arrived in the Port of Miami on November 22, 2000, November 29, 2000 and December 6, 2000.  Florian had not told the agents that Sosa was in the port on those days.  During that period, Florian specifically told the agents that Sosa was not on the boat.  Sosa claimed he had delivered cocaine to Florian on November 22, 2000, November 29, 2000 and December 6, 2000.

During the investigation, Agent Knight questioned Florian about hotel reservations that Florian had made at the Best Western Hotel on Biscayne Boulevard near the Port of Miami from February 24, 2001 through March 1, 2001.   Florian said he had rented the room for visiting relatives, but he could not remember their names. Knight did not believe Florian's account, as he also knew that Florian lived at 3300 S.W, 143rd Place, far away from the Biscayne Boulevard Best Western.  Florian had not told Knight about this reservation when it had happened in 2001.

Agent Knight believed that Florian had made the reservations for Edgar Rios, a known co-conspirator of Edwin Reyes, who was in Miami at that time.  Edgar Rios' customs declaration said that he had arrived on February 27, 2001 and was staying at the Everglades Hotel, which was near the Biscayne Boulevard Best Western.  The investigation ascertained that Rios did not stay at the Everglades Hotel on these dates. Sosa told the agents that Rios was the South American contact who, during 2001, would fly into Miami, receive the cocaine from Florian, and distribute it.

Agent Knight knew that Florian had made a controlled telephone call to Edwin Reyes on November 8, 2000.  During the investigation, Knight obtained Florian's cell telephone records to ascertain whether Florian had been calling Reyes without telling

7

the agents.  During February 2001, Florian called the number associated with Reyes seven times.  On one day when Florian called the number associated with Reyes five times, he also called Agent Knight; however, Florian never told Agent Knight that he had been calling Reyes.

Sosa also said that there was another individual on his boat, Jose Estevez, who was also involved bringing cocaine into Miami for the Alfonso organization.  Florian never mentioned this to the agents.  Seaboard's records indicated that Jose Estevez replaced Sosa on the boat in January 2001.

After the conclusion of the investigation, the agents met with the prosecutors to discuss Florian's cooperation.  The agents concluded that Florian was not truthful based on the evidence collected in the investigation, and Agent Knight did not think Florian's cooperation was either substantial or complete.

During his testimony, Agent Knight expressly denied several allegations made by Florian in connection with the present motions.  Agent Knight testified that he did not meet with Florian in prison on April 9 or 10, 2002 at FDC.  Knight also testified that he would not have visited Florian alone, and that there would have been at least one other agent present.  Knight denied telling Florian that he would get a 40% reduction in his sentence and that if Reyes was apprehended, Florian might receive a further sentence reduction.  Knight said that he did not promise cooperators that they would get a specific sentence reduction and that he would not have been able to fulfill that promise if he made it.

2. <u>Testimony of Defendant Manuel de Jesus Florian</u>

For the reasons discussed in more detail below, the undersigned finds that Manuel de Jesus Florian was not a credible witness, and does not credit any of Florian's

testimony that is not independently corroborated.  This finding is based on his demeanor on the witness stand as well as the internal inconsistencies in his testimony. [2]

a.   Florian's Testimony Regarding His Pre-sentence Cooperation With the Government

Florian testified that on October 31, 2000, a government agent stopped him on the street and took him to the parking lot of a Walgreens on S.W. 137th Avenue and S.W. 40th Street in Miami. Florian immediately agreed to cooperate.  Florian testified at length concerning the nature and extent of his cooperation with the government.  The following is a summary of that testimony.  In response to questioning when he was first approached by the government agents, Florian admitted his participation in the sham cocaine operation and also admitted he had also been involved with Sosa on several other shipments.  He told the agents how much money he had received, and that he still had some of this money.  Florian went home, retrieved the $5,000.00, and turned it over to Customs Agent Sherrie Gordon.

The agents specifically told Florian that he could not engage in cocaine transactions without them being present.  The agents told Florian  what to say on the calls made during conversations that occurred during the course of his cooperation, and what to say when he met with Sosa.  At the direction of the agents, Florian recorded a conversation with Mario Sosa, but it was inaudible due to interference.  Florian brought Agent Knight into the port to see Sosa through a security camera.  They observed Sosa carrying a bag, but Florian told Agent Knight that he did not know what Sosa was

---

[2]  For example, the undersigned finds incredible Florian's hearing testimony that even though he found out, two weeks before his sentencing, that Sosa would soon be arriving in Miami, Florian did not seek to communicate that information to the government until after he was sentenced and imprisoned because (1) he needed to wait for his lawyer to return and (2)  the government only wanted to know when Sosa was here.

carrying in the bag.

Florian also made a controlled call to Edwin Reyes in Honduras, at a number that he said was provided by Sosa.  A few days later, Florian made another controlled call to Reyes to obtain the price for a kilogram of cocaine.  Reyes quoted the same price he gave to Alfonso & Piedra–$16,000.00.  Reyes said he could complete the transaction right away.  Based on the direction he received from Agents Knight and Gordon to delay the transaction so they could prepare to arrest Reyes and Sosa, Florian told Reyes that he couldn't do it then because his friends were getting the money together.

Florian also received and recorded a call from Reyes.  Reyes wanted to know if Florian was ready to complete the transaction.  Florian again said he wasn't ready, that his friends were trying to put the money together, and that he would let Reyes know. Florian gave the tape to Agent Knight.

Florian testified that he never brought the agents to a cocaine transaction with his friends.  Florian also testified that after October 31, 2000, he never engaged in a cocaine transaction with Sosa or with anyone else.

Florian testified that in November 2000, Sosa came into Miami on his ship every week on the same day.  Florian met with Sosa on November 1 and 8, 2000.  Florian told the agents in December 2000 that Sosa had to leave the boat for two weeks due to family trouble in Guatemala.  Sosa returned to the boat after that, and the agents told Florian they were still not ready for the transaction.  Florian testified that Sosa continued to come into Miami through March 2001, but that he did not tell the agents because they knew this information.  At the end of March 2001, Florian told the agents that Sosa was on vacation and was not on the boat, but that Sosa would be returning at the end of October or the middle of November, at the beginning of the season.  Florian did not tell

the agents that Sosa was in Miami again until December 2001.  Florian testified that from November 2000 through April 2001, except for the two weeks during December 2000, if the agents had asked him if Sosa was on the boat, Florian would have told them that he was.

Florian was formally arrested in July 2001.  He was released on bond and able to return to work.  Subsequently, Florian signed a plea agreement and entered a guilty plea.

### b.  Florian's Testimony Regarding His Guilty Plea and Sentencing

On September 7, 2001, Florian pleaded guilty and signed the written plea agreement.  The plea agreement said that Florian would provide substantial assistance to the government.  Florian understood that to mean the cooperation he gave to Agents Knight and Gordon, all things which happened before his formal arrest.  Florian testified that his attorney, Julio Gutierrez, told him that he already had a discussion with the prosecutors, who had agreed that Florian's assistance was substantial, and that he would receive a sentence reduction.

At his plea colloquy, Florian said he understood the written agreement.  Florian testified that he relied on his attorney, who told him that everything on the plea agreement was all right.  His attorney did not read him the agreement, but Florian didn't tell the judge that.  Florian told the judge that he signed the agreement of his own free will.  Florian testified that he remembered that the judge had told him that he could ask questions, but he did not remember asking any.  Florian testified that he thinks he said he was satisfied with his lawyer.  Florian admitted at the hearing that it was clear that the plea agreement stated that it solely up to the government to decide whether they would file a sentence reduction motion.  Florian further admitted at the hearing that he had truthfully answered the judge's questions at the plea colloquy and that he fully

understood his plea.

Florian testified that Sosa did not come to Miami between the date of Florian's arrest in July 2001 and sentencing on November 26, 2001, because Sosa was on vacation.  Florian testified that Sosa worked for Seaboard Marine as a refrigeration technician on a boat that transported watermelons to Miami, and the watermelon season began in mid-November and ended at the end of March.  Therefore, this was the time frame when Sosa worked on that boat.  Prior to Florian's sentencing, no government agent ever told Florian that the government was ready to set up the cocaine transaction.

Around the time that Florian was scheduled to be sentenced, Florian started asking Juan Urbana, the head of the refrigeration mechanics at Seaboard, when Sosa would be coming back to Miami.  Before Florian was sentenced, at a time when Florian was still on bond, Urbana told Florian that Sosa would be coming back on his regular ship beginning in mid or late November.  Florian testified that he waited for his lawyer to get back until telling the agents about Sosa, and that he kept the information about Sosa to himself for a couple of weeks, at least.  Florian also testified that he waited to inform the agents until Sosa was actually on the boat because the agents had told him to just tell them when Sosa is here.

Florian was sentenced in November 2001 to 87 months' imprisonment.  His sentence was not reduced for cooperating with the government.

Florian was remanded after he was sentenced.  From FDC, on December 3, 2001, Florian told his lawyer the name of the boat on which Sosa was arriving, and the day and time the boat would arrive in Miami.   Florian's lawyer gave the information to the government.  On December 5, 2001, Sosa was arrested.

On December 18, 2001, Florian was sent to FCI Miami.  On January 28, 2002,

Florian returned to FDC, and resumed his cooperation.  The agents asked Florian to verify the certain recordings he had made, and to identify Sosa on a Port of Miami videotape made by Agent Knight in November 2000.

Florian testified that on April 10, 2002, Agent Knight saw Florian in FDC and told him they were very happy with him and that he had done a good job, as Sosa had pleaded guilty.  Knight said Florian should call his attorney to get in touch with the United States Attorney's Office.  Knight told Florian he would be recommending a 40% sentence reduction.  Florian told Knight that the United States Attorney's Office had told Florian's attorney from the beginning that there was a possibility of a 50% reduction. Knight told Florian that he didn't know about that, but he would be recommending a 40% reduction.  Knight also said that they were working toward arresting Reyes, and Florian might get additional credit.

Florian testified that when the government did not file a substantial assistance motion at time of Florian's sentencing, Florian believed that Sosa's arrest was what was missing.  When Florian provided the information which led to Sosa's arrest, he believed he had performed what he was asked, but that the government did not do what they had promised.

Later, Florian found out that the United States Attorney's Office was not moving for a reduction because of the things Sosa said about him.  Florian did not have any conversations directly with Sosa about this.  Florian testified that he was never confronted with the results of the agents' investigation, and that other than his denial that Sosa's claims had no basis in truth, he never had the opportunity to address Sosa's specific allegations.  Florian testified that Sosa was arrested and prosecuted because of his assistance.

Florian testified that after October 31, 2000, he did not have any further cocaine transactions with Sosa.  Florian also testified that he did not have any cocaine transactions with Jose Estevez, or any dealings with Edwin Rios.

Florian testified that his undercover activities entailed risk for his family, and also admitted that being involved with the drug business was also dangerous for him and his family.

In 2002, Florian switched lawyers to find out why he was not getting a sentence reduction. At a 2002 meeting with the agents, Florian was told he was not being fully and completely truthful regarding the prior events, and he was given a chance to satisfy the agents.  Florian told the agents he had not done any of the things that Sosa said he had done. The agents told him they would investigate.

In September 2003, Florian hired another attorney, Joel Robrish, who said that the prosecution was not willing to recommend a sentence reduction for Florian.

B.  **The Government's Case**

1.  **Testimony of ICE Special Agent Sherrie Gordon**

Immigration and Customs Enforcement Special Agent Sherrie Gordon was the co-case agent in the Alfonso investigation.  She testified that Florian had cooperated in the Alfonso investigation by 1) giving the agents information about Sosa's criminal activities; 2) engaging in audio taped conversations which tended to incriminate Sosa; 3) giving Agent Knight an opportunity to view Sosa on the Seaboard Marine video monitor system; 4) telling Edwin Reyes that he was not ready to complete a cocaine transaction to allow the agents to prepare a controlled transaction; and 5) by informing the agents in December 2001 that Sosa was in Miami.  Agent Gordon said that Florian appeared to have done everything the agents asked him to do, but that these actions did not amount

to substantial assistance because of the results of the investigation conducted after the agents debriefed Sosa.

In February 2002, she debriefed Sosa, who told her of several drug transactions that he and Florian had participated in.  Sosa's statement were inconsistent with Florian's statements, so the agents conducted an investigation to ascertain who telling the truth.  The agents looked at hotel records, the records for Florian's cell phone, travel records and records from Seaboard Marine, the employer of both Florian and Sosa.  The agents concluded that there was more corroboration for Sosa's statements than for Florian's statements.  Agent Gordon testified that, for example, the agents determined that on February 27, 2001, Florian called a telephone number associated with Edwin Reyes when Edgar Rios was staying in a downtown Miami hotel room reserved by Florian.  Also on February 27, 2001, Florian, using his cell phone, also called Agent Knight.  The records from Seaboard Marine confirmed Sosa's statements to the agents, and were inconsistent with Florian's statements.  Florian also never told the agents that subjects of the investigation from Central and South America had been in Miami, and this would have been important to the agents.

Florian had told the agents he was involved with one cocaine transaction with Sosa in August 2000 and two in September 2000.  Sosa denied engaging in these transactions.  Seaboard Marine's records indicated that Sosa was not on the boat on those dates.  However, Florian also admitted a cocaine transaction with Sosa in October 2000, and  Seaboard Marine's records corroborated that Sosa was on the boat on that date.

Sosa told the agents that he had done cocaine transactions with Florian on November 22, 2000, November 29, 2000 and December 6, 2000.  The Seaboard Marine

records indicated that Sosa had been on the boat on these dates.  The Seaboard Marine records also indicated that Sosa had been on the boat until late March 2001.

Agent Gordon was involved with the decision not to file a Rule 35 motion for reduction of Florian's sentence.  The decision was based on the evidence collected after Sosa's debriefing.  Nothing about Florian's race or religion went into the decision.  Gordon testified that she recognized that Sosa had a motive to further incriminate Florian because Sosa knew that Florian had been responsible for Sosa's arrest.  However, the agents used documentary evidence to determine that Sosa was more credible than Florian.  The decision not to request a sentence reduction was based upon the determination that Florian had not been completely truthful with the agents.

IV.  Legal Analysis

A.  The Legal Standard

In *Wade v. United States*, 504 U.S. 181 (1992), the United States Supreme Court set forth the standard to be used in determining whether the government can be compelled to file a motion for reduction of sentence based upon a claim by the defendant that he has provided substantial assistance which the government has wrongfully refused to recognize.  The Court held that "federal district courts have the authority to review a prosecutor's refusal to file a substantial assistance motion and to a grant a remedy if they find that the refusal was based on an unconstitutional motive." *Id.* at 185-86.  The Court noted that a defendant could obtain relief if the decision was based upon a defendant's race or religion, or "if the prosecutor's refusal to move was not rationally related to any legitimate Government end." *Id.* at 186.

In *United States v. Forney*, 9 F.3d 1492 (11th Cir. 1993), the Eleventh Circuit applied *Wade* to strictly construe the circumstances under which the government can be

required to file a substantial assistance motion in the context of a plea agreement similar to the one in the case at bar.  The defendant in *Forney* claimed that he gave the government a significant amount of information, that he identified pictures shown to him, that he worked regularly with the government, and that many arrests could have been made.   Forney said that the government agent informed Forney that he chose not to act on his information because 'they are too small for me to do.'  Regarding the plea agreement, Forney stated: "I don't think I would have ever signed that [the plea agreement] if I knew that.  I would have never signed that if I knew what they were going to do.  Because I told them up front what I could do for them and what I would try to do for them, and I did every single thing I told them that I could try to do, everything."  While Forney's statements were not contradicted by the government, the government did not file a substantial assistance motion, and the district court therefore did not depart below the 120 month mandatory minimum sentence established by statute.

In upholding the government's refusal to file a motion, the Eleventh Circuit emphasized that the defendant had failed to allege an unconstitutional motive.  Although the Eleventh Circuit at least implied that a claim of bad faith was not subject to judicial review, it specifically ruled that Forney had not raised the issue of bad faith with sufficient specificity in the court below.[3]  The Eleventh Circuit emphasized the broad discretion of the prosecution in this area, and that the role of the court is not to evaluate the assistance rendered by a defendant <u>unless and until</u> the government files a substantial assistance motion.  In sum, the courts are not permitted to intrude into the exercise of prosecutorial discretion, absent unconstitutional motives.  *Id.* at 1502, n.4.

---

[3]  "Forney's attempt to allege bad faith by the government for not making a 5K1.1 motion is unavailing because he did not raise this objection with the district court at the sentencing proceeding."  9 F.3d at 1500.

Subsequently, in *United States v. Nealy*, 232 F.3d 825 (11th Cir. 2000), the Eleventh Circuit reaffirmed the principles announced in *Forney*.  In *Nealy*, the government conceded that the defendant had provided what would otherwise qualify as substantial assistance meriting a motion for downward departure; however, the government refused to file the motion based upon the defendant's involvement in subsequent criminal activity.  The defendant claimed that it was a violation of due process for the government to refuse to file such a motion for reasons other than the nature of the substantial assistance provided.  Once more, the Eleventh Circuit refused to limit prosecutorial discretion, considering and rejecting the due process claim, apparently on the merits, and holding that judicial review is limited "to claims of unconstitutional motive," which had not been alleged.  *Id.* at 831.

Florian does not claim that the government was motivated by constitutionally impermissible factors such as race or religion.  Rather, he bases his claim for relief upon his contention that the government breached its plea agreement regarding consideration of his cooperation and acted in bad faith.  However, at the evidentiary hearing, Florian testified that it was clear that the plea agreement stated that it solely up to the government to decide whether it would file a sentence reduction motion.  Therefore, for the reasons set forth below, the undersigned Magistrate Judge finds that the government's actions in the case at bar were appropriate, were in good faith, and fall far short of the constitutional violation which would support relief.

B.  <u>The Government's Decision Was Appropriately Made</u>

Based upon the evidence presented at the hearing, the undersigned Magistrate Judge finds when Florian was apprehended by the government in October 31, 2000, Florian admitted his participation in the Ricardo Alfonso cocaine conspiracy, and agreed

to cooperate during with the government.  The undersigned further finds that as part of

his cooperation, Florian: gave the agents information about Sosa's criminal activities;

engaged in controlled audio taped conversations intended to incriminate Sosa; gave

Special Agent Knight an opportunity to view Sosa on the Seaboard Marine video monitor

system; and told Edwin Reyes, in controlled audio taped conversations that he was not

ready to do a cocaine transaction to allow the agents to prepare a controlled transaction.

In December 2001, after Florian had been formally arrested, had pleaded guilty and had

been sentenced, Florian, from prison, informed the agents that Sosa was in Miami.  This

led to Sosa's arrest, guilty plea and cooperation.

Sosa's cooperation detailed drug transactions and interactions with Florian which

was substantially different than the information provided by Florian.[4]  After an

investigation which reviewed travel records, work records, telephone records and hotel

records, the case agents determined that Florian had failed to disclose to the agents

numerous drug transactions in which he was involved with Sosa, as well as undisclosed

contacts with other members of the conspiracy.  Florian was provided with an

opportunity to explain the inconsistencies, but merely denied them.  Therefore, the

agents recommended that because Florian's cooperation had been neither complete nor

truthful, no sentence reduction motion should be filed, and the United States Attorney's

Office concurred.  The undersigned expressly credits the testimony of Agent Gordon in

this regard.[5]

The undersigned Magistrate Judge finds that there was no unconstitutional

---

[4]  Sosa did not receive a sentence reduction for his cooperation (DE # 36 at 5).

[5]   This credibility determination is based upon her demeanor as a witness, and by the evidence in the record which shows the extensive actions taken by the government to determine whether Florian had been truthful.

motive in the government's decision not to file a motion to reduce sentence.  Moreover, Florian does not contend that there was such a motive.

The undersigned further finds that the government acted in good faith in examining Florian's cooperation, its nature and extent, and Florian's truthfulness and completeness.  The undersigned concludes that the government also acted in good faith when it made its determination, after conducting an investigation, that it believed Sosa and disbelieved Florian, and in then determining that a motion for reduction of sentence was not warranted under the circumstances of this case.  The undersigned specifically finds that even though the government may not have been required to give Florian an opportunity to address the government's concerns, the government gave Florian that opportunity.

The undersigned rejects Florian's argument that the government's failure to file a sentence reduction motion violated the plea agreement.  It is undisputed that the plea agreement gave the government the virtually unreviewable discretion as to whether to file a sentence reduction motion.  Nothing in the plea agreement required the government to file a sentence reduction motion based on substantial assistance if it determined, after the execution of the plea agreement, that Florian's cooperation had not been truthful and complete.

The undersigned specifically credits the testimony of Agent Knight that he did not visit Florian in FDC in April 2002 and promise Florian a reduction in sentence.  The undersigned also credits Knight's testimony that he never made any specific promises to Florian that his sentence would be reduced or would be reduced by a certain amount.

V.  Conclusion

In sum, the undersigned Magistrate Judge concludes that there was no breach of

the plea agreement, and that the government acted in good faith and did not violate Florian's constitutional rights.  Under these circumstances, the District Court does not have jurisdiction to order the government to file a motion for reduction of sentence, or to reduce the sentence in the absence of such a motion.

Therefore, for the reasons stated above, it is hereby

**RECOMMENDED** that Defendant Manuel de Jesus Florian's duplicate Motions for Specific Performance of the Plea Agreement (DE ## 33, 34), be **DENIED**.

The parties will have ten days from the date of service of this Order within which to file written objections, if any, for consideration by the Honorable Alan S. Gold, United States District Judge.  Failure to file objections timely shall bar the parties from attacking on appeal any factual findings contained herein.  *LoConte v. Dugger*, 847 F.2d 745 (11th Cir.), *cert. denied*, 488 U.S. 958 (1988); *RTC v. Hallmark Builders, Inc.*, 996 F.2d 1144, 1149 (11th Cir. 1993).

**DONE AND SUBMITTED** in chambers in Miami, Florida, on March 30, 2007.

*Andrea M. Simonton*
ANDREA M. SIMONTON
UNITED STATES MAGISTRATE JUDGE

Copies to:
The Honorable Alan S. Gold
    United States District Judge
All counsel of record